IN RE REVOCATION OF LICENSE TO PRACTICE
MEDICINE OF GOTTFRIED SCHMIDT.
MINNESOTA STATE BOARD OF MEDICAL EXAMINERS v.
GOTTFRIED SCHMIDT.[1]

May 17, 1940.

No. 32,405.

[1]Reported in 292 N. W. 255.

*Ray E. Lane* and *John C. Zehnder,* for appellant.

*J. A. A. Burnquist,* Attorney General, *John A. Weeks,* Assistant Attorney General, and *F. Manley Brist,* for respondent.

STONE, JUSTICE.

Dr. Schmidt's license to practice medicine was suspended for a period of five years by the state board of medical examiners. There was an appeal to the district court of Ramsey county (1 Mason Minn. St. 1927, § 5707). After hearing, the appeal was dismissed. Dr. Schmidt appeals.

We agree with the trial judge that the order of the board of medical examiners "was neither arbitrary, oppressive nor unreasonable, and that the evidence * * * afforded a reasonable and substantial basis for the order made by the Board suspending relator's license."

1. The statutes under which the board proceeded are 1 Mason Minn. St. 1927, § 5707, *et seq.* Dr. Schmidt had twice been warned by the board before the formal charges which are the basis of this proceeding. The occasion of the latter was a complaint by one of his former patients. He was charged, as the statute provides, with having conducted himself in a manner unbecoming a person licensed to practice medicine in this state, with resulting detriment to the best interests of the public. There were other specifications of misconduct, but it is enough to consider the charge of improper and unprofessional diagnosis.

It was the practice of Dr. Schmidt to diagnose a variety of human ailments by a method our description of which is based upon his own testimony. He would put a piece of wood pulp paper, moistened by the saliva of the patient, on the patient's abdomen. "Then we get this line on the person's abdomen." On the area so selected the test paper would be placed. "Then, in testing the drugs [*i. e.,* in selecting the medicine], we put the drug in the patient's hand; left hand for female and right hand for the male. And if that fits that person, that [some line on the abdomen] will go down deeper, three or four finger-breadths deeper."

The doctor's theory, long and admittedly applied in his practice, was that in the manner stated there would be some reaction, apparent to him, resulting from placing the paper on the patient's abdomen. Thereby he could tell which of the bottles or boxed medicines held in the patient's hand would effect a cure, or, at least, which would be most likely to do so.

That is not all. The doctor frankly professes ability to make a fairly dependable diagnosis even though he does not examine or has never seen the patient. All he thinks he needs is the test paper, moistened on the patient's tongue. If that were sent him, as many were from absentee patients, he made the test on a "subject," that is, "on some other individual's abdomen." In such a case the "subject" would hold the drug or drugs in his hand and the doctor would diagnose according to the reactions apparent to him.

At least in the case of absentee patients, of whom there were many, the invariable treatment consisted of pills or pellets, compounded of "sugar and milk." They had no other content. According to the doctor, their therapeutic potency came from "energy" with which he charged them from a machine and a certain "hookup," the result being to make "this medicine." Needless to say, appellant made no attempt to justify his habitual methods of diagnosis or treatment on any scientific basis.

That is enough, we think, to show why no judge, or any number of them, could say, judicially or otherwise, that the action

of the board was without abundant foundation in the evidence. It cannot be otherwise until the methods of the aboriginal medicine man, the witch doctor, and voodooism are demonstrated to be superior to those of modern science as applied in the field of medicine. The board of seven competent doctors adhered to the notion that the accomplishments of biochemistry and microscopy, with their diagnostic disclosures (which in many cases go to the point of demonstration) are superior to quackery, ancient and modern. It is just impossible for a court to disagree with them.

The argument that the action of the board was either in process or result a denial of due process or equal protection of law is without merit. See State ex rel. Powell v. State Medical Examining Board, 32 Minn. 324, 20 N. W. 238, 50 Am. R. 575; State ex rel. Chapman v. State Board of Medical Examiners, 34 Minn. 387, 26 N. W. 123. We appreciate that appellant's attack is not on the law as such. It is rather and only on the action of the board in this case. The charge is the frequent one made against administrative boards, that they act both as prosecutors and judges. Enough answer for this case is that appellant was given ample notice of the nature of the charges against him, with an opportunity for hearing. He was heard at length in his own defense. Finally, the whole proceeding before the board is and has been subject to court review.

2. There is no merit in such argument as there is for appellant that the board denied him the privilege of adducing certain witnesses whose testimony was wanted. There were three of them. They had been present at the hearing, but left before its conclusion. The board refused an adjournment in order to take their testimony, but they were informed in substance what it would be. The absent witnesses were all laymen whom appellant had treated successfully. He did not show, by offer of proof or otherwise, just what advantage he expected from their testimony. It is clear that it would not have gone at all to the main charge against him, that based on his diagnostic methods. They were so clearly bald quackery and so much an imposition on his pa-

tients that the testimony of three patients with whom he had had good luck would not have helped him.

Order affirmed.

